## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Craig R. Becker, LT, USN
United States Disciplinary Barracks
1301 N. Warehouse Rd.
Fort Leavenworth, KS  66027

        Plaintiff,

   v.

Department of the Navy
1200 Navy Pentagon
Washington, DC 20310-1200

        Defendant.

Case No.:  1:24-cv-152

COMPLAINT FOR COMPELLING
PRODUCTION OF AGENCY RECORDS
PURSUANT TO THE FREEDOM OF
INFORMATION ACT

## COMPLAINT TO COMPEL PRODUCTION OF AGENCY RECORDS PURSUANT TO THE FREEDOM OF INFORMATION ACT

On October 8, 2015, Johanna Becker, the wife of Craig R. Becker, LT, USN, fell to her death from a window of the couple's apartment in Mons, Belgium.  Despite the United States having primary jurisdiction over the incident under Article VII of the North Atlantic Treaty Organization (NATO) Status of Forces Agreement (SOFA), it allowed the Belgian government to investigate the death and then charge LT Becker in Mrs. Becker's death, arrest, and incarcerate him.  It was not until January 5, 2018, after LT Becker sought relief in the District Court to compel the Navy to take jurisdiction of the case, that the then-Secretary of Defense, James N. Mattis, directed the Navy to assert jurisdiction over LT Becker's case.  Following that, the Navy preferred charges of murder, assault, and conduct unbecoming an officer against PLT Becker.  He was subject to court-martial in Belgium in April 2022.  He was convicted and

sentenced to life imprisonment with the possibility of parole.  He is currently serving that sentence at the United States Disciplinary Barracks while his case is pending appeal.

Thereafter, LT Becker sought production of documents related to the government's decision to 1) delay asserting jurisdiction and 2) request the Secretary of Defense cede jurisdiction over LT Becker to Belgium.  The Navy has identified documents that it has deliberately delayed providing to LT Becker, has redacted scores of pages in their entirety, and failed to respond to LT Becker's appeals of government decisions.

LT Becker now brings suit, pursuant to the Freedom of Information Act, to compel the Navy to provide the documents to him.

## I.    JURISDICTION AND VENUE

1.  This Court has jurisdiction and venue pursuant to 5 U.S.C. § 552(a)(4)(B), which grants jurisdiction to the District Court for the District of Columbia to hear all complaints to compel production, under FOIA, of requested records improperly withheld from the complainant.

## II.    THE PARTIES

2.  Plaintiff Craig R. Becker is a Lieutenant (O-3) in the United States Navy.

3.  Defendant United States Navy has responsibility for the administration, control, and operation of the United States Navy ("USN").

## III.    STATEMENT OF THE FACTS

4.  LT Becker and his wife, Johanna, were transferred by the Navy from the United States to Supreme Headquarters Allied Powers Europe (SHAPE) in Belgium in 2013.

5.  They resided off-base in an apartment at 2a Rue Des Archers, 7000, Mons, Belgium.

6.  On the evening of October 8, 2015, Mrs. Becker fell from her bedroom window to the street, seven floors below.  An eyewitness across the street testified that she only saw Mrs. Becker

in the window before she fell.  That same witness identified the color and clothing Mrs. Becker was wearing when she fell to her death.

7. Mrs. Becker was taken to a nearby hospital but succumbed to her injuries later that same evening.

8. Local Belgian police investigators initially responded to the scene and questioned LT Becker about the incident.  They were joined by Belgian police from SHAPE.

9. On October 9, 2015, Belgian authorities informed the United States Army Criminal Investigation Division (CID) of the incident as an American service member and dependent were involved and CID subsequently informed the Naval Criminal Investigative Service (NCIS).

10. Members of LT Becker's chain of command was also informed.

11.  Article VII of the NATO SOFA provides that the "sending state" (here, the United States) has primary jurisdiction over crimes committed by a member of its forces when the crime involves another member of that force or a dependent of a member of that force.

12. Mrs. Becker was in Belgium as LT Becker's dependent.

13. Thus, under the explicit terms of the NATO SOFA, the United States and Belgium shared jurisdiction but the United States had primary jurisdiction to investigate and, if needed, prosecute the incident.

14. Despite the United States having primary jurisdiction, Belgium police carried out the investigation and advised government authorities that if they wanted United States' assistance, they would ask for it.

15. On October 16, 2015, attorneys from the Northern Law Center (a United States Army office designated as the United States' representative to Belgium for foreign criminal jurisdiction

matters) advised NCIS to delay asserting jurisdiction, ostensibly for fear that Belgium would cease any investigative actions and, supposedly, the United States would lose access to Belgian witnesses.

16. On March 18, 2016, Belgian authorities arrested LT Becker for murder and he was incarcerated in a Belgian prison.

17. On March 22, 2016, the Northern Law Center again advised to delay asserting jurisdiction to allow the Belgian authorities to complete the investigation.

18. Emails from the Northern Law Center produced under a FOIA request demonstrated that the Navy always intended to assert jurisdiction over LT Becker once the investigation was complete.

19. The Northern Law Center emails also show that the rationale for the Navy's delay in asserting jurisdiction was because Belgian investigators could do whatever they wanted, while if the United States took over, its investigators would have to go through the letters rogatory process and comply with more stringent rights available to an accused.

20. In June 2016, United States' authorities received a copy of the Belgian investigation.

21. On July 14, 2016, LT Becker was released from the Belgian prison and placed on house arrest by Belgian authorities.

22. In January 2017, Navy attorneys recommended that the U.S. cede jurisdiction to Belgium because Belgian investigative techniques and evidentiary collection procedures might not hold up in a United States court martial and because, ostensibly, among other reasons as detailed *infra*, it might not be possible to compel Belgian citizens to testify.

23. On May 3, 2017, the Commander, Naval Forces Europe sent a formal request to the Secretary of Defense, through the Commanding General, U.S. Army, Europe, Commander,

U.S. European Command, and the Secretary of the Navy, asking that the United States cede jurisdiction.

24. On November 7, 2017, LT Becker filed a Petition for a Writ of Mandamus in the U.S. District Court for the District of Columbia, requesting the court direct the government to assert jurisdiction over his case.

25. On January 2, 2018, the Secretary of Defense, James N. Mattis, ordered the Navy to assert jurisdiction over LT Becker's case.

26. From the time he was first questioned by Belgian authorities until he was released to the United States, a Navy Judge Advocate, a uniformed lawyer, was not detailed to represent LT Becker, even though the Navy always planned to assert jurisdiction and try LT Becker in a court-martial.

27. LT Becker was tried by court-martial and convicted on April 30, 2022.

28. 10 U.S.C. § 837 and Manual for Courts-Martial, United States, Rule for Courts-Martial 104 prohibit "Unlawful Command Influence."

29. The statute and Rule state: "No person subject to the code [Uniform Code of Military Justice] may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case or the action of any convening, approving, or reviewing authority with respect to such authority's judicial acts."

30. On appeal, LT Becker's appellate counsel sought records relating to the Navy's decision to delay asserting jurisdiction as well as the recommendation by the Navy to cede jurisdiction, as those decisions could be construed as unlawful command influence.

31. Toward that end, undersigned counsel submitted several Freedom of Information Act
    requests.

32. On December 5, 2022, counsel submitted a request to the Department of the Navy via its
    "FOIAonline" website, seeking "any and all documents the Navy maintains, including but
    not limited to letters, emails, notes of conversations, forms, notes of meetings, and any other
    documented [sic] related to the decision by the Navy to recommend against the United States
    asserting jurisdiction in the case, as well as the ultimate decision by the Secretary of Defense
    to have the Navy assert jurisdiction."  Exhibit 1.

33. The request sought documents from the Office of the Secretary of the Navy and its staff
    offices, the Navy Judge Advocate General office and all of its suboffices, the command and
    legal offices of Navy Region Europe, Africa, Central (formerly known as Navy Region
    Europe, Africa, Southwest Asia), the command and legal offices of Sixth Fleet, the Naval
    Criminal Investigative Service, and any other Navy office that could have been involved in
    the decision to assert jurisdiction.

34. That request was broken into several components by the Navy: the Secretary of the
    Navy/Chief of Naval Operations FOIA Office (DNS-36) assigned tracking number DON-
    NAVY-2023-002479; Commander, Navy Region Europe, Africa, Central, tracked the
    request under number DON-NAVY-002596; the Sixth Fleet tracked the request under DON-
    NAVY-002593; and the Naval Criminal Investigative Service tracked it under DON-NAVY-
    002587

35. On December 12, 2022, counsel received a response, not on letterhead, signed by N.R.
    D'Arco stating: "our search for responsive records encompassed all records in existence as of
    5 December 2022, the date you submitted your request.  Search for records included files

6

maintained by Commander, Navy Region Europe, Africa, Central. However, despite our diligent search of all relevant documents, we haven't found any responsive document that would be considered under our custody." Exhibit 2.

36. On December 16, 2022, counsel appealed the response, stating that they already had copies of documents from 2017 and 2018 that were responsive to the request and asked the Navy to initiate a new search. Exhibit 3.

37. On January 12, 2023, counsel received a letter from the National Security Law Division of the Navy's Office of the Judge Advocate General (OJAG), identifying 428 pages of documents responsive to LT Becker's request, but redacting 290 pages of those documents and withholding 138 pages completely. Exhibit 4.

38. The letter stated that the redactions were made under "FOIA exemptions (b)5) and (b)(6)" and other documents were withheld in their entirety "pursuant to FOIA exemption (b)(5)."

39. The letter also stated that the author had determined that responsive documents should be withheld "pursuant to the deliberative process privilege and the attorney work product privilege" and some information was withheld because it would "constitute a clearly unwarranted invasion of personal privacy."

40. The letter also stated that the "review included consideration of the 'foreseeable harm standard'."

41. Other than those boilerplate statements, no explanation of the contents of the withheld and redacted information was provided.

42. On February 20, 2023, counsel timely appealed to the OJAG, General Litigation Division (Code 14), noting that of the 290 pages released by the Navy, "over 80 are redacted in their entirety and numerous pages of emails are completely redacted with the exception of the date

and the subject line. In fact, the bulk of the non- or slightly-redacted documents provided by the Navy are a copy of the U.S.-Belgium Mutual Legal Assistance Treaty (53 pages in several languages) and copies of correspondence sent by LT Becker's defense attorneys to Senators and Congressmen in an effort to get the U.S. to assert jurisdiction."  Exhibit 5.

43. In that appeal, counsel requested the Navy review the redacted documents again and release them or provide an index of the documents that were withheld, and reminded the Navy that it was "required to provide a written response describing the reasons for the denial, names and titles of each person responsible for the denial, and the procedures required to invoke judicial assistance in this matter" in accordance with 5 U.S.C. § 552(a)(6)(ii) and 32 CFR § 286.11.

44. Receiving no response, counsel followed up with the Navy on June 23, 2023, requesting the status of the appeal.

45. On September 16, 2023, counsel again requested the status of the FOIA appeal, this time via an email to the Navy FOIA Public Liaison Office, as well as the Navy FOIA office.

46. In addition to the FOIA request to the Navy, on December 5, 2022, counsel sent a request to U.S. European Command (EUCOM) seeking the same information as in ¶ 32, asking that the search include EUCOM headquarters (HQ), SHAPE HQ, both HQ's legal staffs, the Northern Law Center, and any other EUCOM or SHAPE office that might have been involved in the decision.

47. On March 31, 2023, counsel received a letter from the Northern Law Center, providing a series of documents and noting that other documents found by the Northern Law Center belonged to the Navy and the Northern Law Center was sending them to the Navy to allow it to determine what it would release.

48. On May 8, 2023, the Northern Law Center informed counsel that it sent the Navy two pdf files with 382 pages of documents the Northern Law Center believed were responsive to LT Becker's request and informed counsel how to request those documents from the Navy.

49. On May 15, 2023, counsel requested that the Navy release the documents that were forwarded to it by the Northern Law Center.

50. On May 16, 2023, the OJAG Freedom of Information Act Department sent counsel an email stating the documents requested were not available as the case was under appellate review.

51. Later that day, that office sent another email saying that the documents had been forwarded to another OJAG office and to contact them for status.

52. On May 22, 2023, counsel sent an email to the OJAG FOIA office asking which email was accurate.

53. On May 30, 2023, the OJAG FOIA office responded that the documents had been forwarded to Code 13 (the Administrative Law Division) in OJAG and to contact that office.

54. On May 30, 2023, counsel asked Code 13 for the status of our request for release.

55. On May 31, 2023, Code 13 responded that there were several offices reviewing the documents and they hoped to have the decision by June 12, 2023.

56. On July 13, 2023, counsel followed up with Code 13 and four days later Code 13 responded that the records were with the Navy FOIA office and they hoped to have them back by the end of the week.

57. On September 16, 2023, counsel followed up with Code 13 regarding the status of the release but received no response.

58. On October 19, 2023, counsel again followed up.  This time counsel was informed that a different attorney had taken over the FOIA portfolio, but that attorney was on leave.

59.   On October 25, 2023, the Navy's FOIA/Privacy Act Program Office sent a final response to the December 5, 2022 request. Exhibit 6.

60.   The letter was accompanied by three sets of documents. One was labeled "RLSO 4.26.23 Responsive Records_Non Duplicative_Redacted". The second was labeled "OJAG 3.2.23 Code 13 Responsive Records_Redacted", and the third was labeled "OJAG 6.14.23 NLC Responsive Docs Redacted". Group 1 was six pages, completely redacted with the exception of three pages of an email chain in which 5 sentences and signature blocks (without names) were readable. Group 2 was 114 pages. Pages 2-71 were redacted in their entirety, pages 72-106 were highly redacted emails, some of which appear to concern a news story that the San Diego Union-Tribune was planning to write regarding LT Becker's case.

61.   Curiously, there is an August 11, 2017 email from RADM John Hannink [then-Deputy Judge Advocate General of the Navy] to the Secretary of the Navy and the Chief of Naval Operations titled "Media interest-Navy member overseas". VADM James Crawford [then-Judge Advocate General of the Navy] is "cc'd" on the email and reply from the Chief of Naval Operations. Yet, during LT Becker's court-martial, the government explicitly and frankly unbelievably represented to the presiding judge and the defense that there were no emails in VADM Crawford's records that referred to LT Becker. The final pages, 107-114, are also redacted in their entirety.

62.   The third group consists of the documents sent to the Navy by the Northern Law Center. Of the 382 documents, the Navy only released 82. Of those, pages 1-4 were completely redacted, pages 5-64 are heavily redacted emails that seem to mention interaction with Belgian authorities and the effort to cede jurisdiction, pages 65-81 are redacted in their

entirety, and page 82 is the French-language translation of Secretary Mattis's letter denying the Navy's request to cede jurisdiction.

63. In explaining the basis for withholding and redacting, the letter stated: "The OJAG Code 13 conducted a search of their local and electronic files and located 723 pages of documents responsive to your request.  Upon review of the OJAG's documents it was determined that 492 pages of those documents are redacted pursuant to FOIA exemptions (b)(5) and (b)(6). 93 pages of those documents were duplicative and have previously been released to you by the Office of the Judge Advocate General (OJAG), National Security Law Division (Code 10). 138 pages of those documents are withheld in their entirety pursuant to FOIA exemption (b)(5), The documents contain instances of deliberative process privileged material, are predecisional in nature, and/or contain working versions of documents, and are thus exempt from disclosure under 5 U.S.C. § 552(b)(5).  These records contain frank and open discussion on predecisional matters.  Due to the sensitive nature of such discussions, disclosure could discourage such forthright discussion on future reviews, impairing the decision-making process.  Therefore, those portions are exempt from disclosure."

64. On November 7, 2023, counsel for LT Becker appealed the Navy's final response letter of October 25, 2023.  Exhibit 7.

65. The Navy had 20 days to respond to the appeal letter, making the response due no later than November 28, 2023.  The Navy, again, has sought to disregard and violate federal law.

## ARGUMENT

### Claim for Relief:

### Freedom of Information Act, 5 U.S.C. § 552

**Claim 1:** **The Department of the Navy violated the Freedom of Information Act by failing to respond timely to LT Becker's appeal of its FOIA release decision in DON-NAVY-2023-002479.**

66. LT Becker realleges and reincorporates the information in the foregoing paragraphs as though fully set forth herein.

67. The Department of the Navy is an agency subject to FOIA, 5 U.S.C. § 552, and must therefore release in response to a FOIA request any disclosable records in its possession at the time of the request and provide a lawful reason for withholding materials as to which it is claiming an exemption.

68. Under 5 U.S.C. § 522(a)(6)(C), a person making a request for materials under FOIA "shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions" of FOIA.

69. Under 5 U.S.C. § 552(a)(6)(A)(ii), the Navy was required to decide LT Becker's appeal within 20 business days of receipt.

70. To date, the Navy has not responded to LT Becker's appeal, even though more than 20 days have passed since the appeal was sent.

71. Therefore, LT Becker is deemed to have exhausted his administrative remedies and the Navy's failure to provide unredacted portions of the responsive documents violates FOIA.

**Claim 2:** **The Department of the Navy violated the Freedom of Information Act by improperly withholding records responsive to LT Becker's request.**

72. LT Becker realleges and reincorporates the information in the foregoing paragraphs as though fully set forth herein.

73. Under 5 U.S.C. § 552(a)(3)(A), an agency "must upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person.

74. Under 5 U.S.C. § 552(a)(8)(A)(i), agencies must "articulate both the nature of the harm [from release] and the link between the specified harm and specific information contained in the material withheld." *Reps. Comm. For Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021).

75. Here, the Navy has utterly failed to make records "promptly available" by misapplying legitimate exceptions to various records, as well as failing to properly apply the "foreseeable harm" standard.

76. "In the context of withholdings made under the deliberative process privilege, the foreseeability requirement means that agencies must concretely explain how disclosure 'would'—not 'could'—adversely impair internal deliberations." *Reporters Committee*, 3 F.4th at 369-70. The agency may not simply rely on "boilerplate and generic assertions that release of any deliberative material would necessarily chill internal discussions." *Id*. at 370. Rather, it must give "a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward." *Id*.

77. In its responses, the Navy, again, failed to provide any explanation or differentiation among its redactions and withholdings.

78. As this Court has noted, "In light of this [the FOIA Act's] overwhelming emphasis upon disclosure, it is anomalous but obviously inevitable that the party with the greatest interest in

obtaining disclosure is at a loss to argue with desirable legal precision for the revelation of the concealed information."   *Vaughn v. Rosen*, 484 F.2d 820, 823 (D.C. Cir. 1973).

**Claim 3:  The exemptions claimed by the Navy do not apply as the documents evidence government misconduct.**

79.   LT Becker realleges and reincorporates the information in the foregoing paragraphs as though fully set forth herein.

80.   "[W]here there is reason to believe the documents sought may shed light on government misconduct, the privilege is routinely denied, on the grounds that shielding internal government deliberations in this context does not serve the public's interest in honest, effective government." *In re Sealed Case*, 121 F.3d 729, 738 (D.C. Cir. 1997).

81.   18 U.S.C. § 242 makes it a crime to willfully subject "any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States."

82.   On October 8, 2015, Johanna Becker fell to her death from her apartment's bedroom window.

83.   The incident was initially investigated by Belgian police.

84.   On October 14, investigators from the Naval Criminal Investigative Service arrived in Belgium from Italy and learned that the Belgian police believed LT Becker was involved in his wife's death.

85.   Despite the fact that the U.S. had primary jurisdiction over the case under the NATO Status of Forces Agreement, the Belgian police told the United States its involvement would be limited to providing assistance as requested by Belgium.

86.   Attorneys from the Northern Law Center advised NCIS that the United States should not assert jurisdiction and allow the Belgians to proceed with the investigation.

87.  The United States allowed the Belgians to investigate and when completed, it would assert jurisdiction and try LT Becker in a court-martial.  This was specifically and explicitly stated in emails from the Northern Law Center.

88.  On March 18, 2016, Belgium arrested LT Becker and confined him to a Belgian prison.

89.  Sometime in late 2016, Navy prosecutors began to discuss a desire to have the Navy cede jurisdiction and allow Belgium to try him in a Belgian court.

90.  On May 3, 2017, the Commander of Naval Forces Europe, Near East sent a recommendation through military channels to the Secretary of Defense requesting that the U.S. not assert jurisdiction.

91.  On January 2, 2018, the Secretary of Defense disapproved the recommendation and directed that the appropriate authorities assert jurisdiction.

92.  On January 5, 2018, the Northern Law Center informed Belgium that the U.S. was asserting jurisdiction.

93.  On January 8, 2018, Belgium dismissed the charges against LT Becker and he was released to the U.S. on January 9, 2018.

94.  Throughout the investigation and incarceration period, LT Becker did not have the services of a Navy Judge Advocate, even though, the Navy intended to try him at court-martial and not in a Belgian court.

95.  Additionally, despite knowing that Belgian courts did not guarantee the same rights that LT Becker enjoyed under the Constitution, the Navy tried to have him tried in that system.

96.  The Navy claimed that differences between U.S. and Belgian investigative procedures could raise questions as to the admissibility of evidence in an American court-martial.

97. Thus, the U.S. first allowed a foreign investigation whose standards dramatically truncated the United States' standards to gather evidence against LT Becker and allowed LT Becker to be questioned without an American attorney while knowing it intended to take any criminal result to court martial. Upon information and belief, LT Becker was subject to interrogation by Belgian officials with United States law enforcement present.

98. Then, the U.S. attempted to cede jurisdiction over LT Becker to a Belgian judicial system that the U.S. knew would not provide him the trial rights to which he was entitled as an American – he would not receive a jury trial, he had no right of confrontation, and hearsay evidence would be allowed.

99. The actions of the U.S. violated LT Becker's constitutional rights. Internal discussions in which constitutional violations are proposed and even acted upon are not protected under any FOIA exception and all documents should be released to LT Becker.

**Claim 4 – Notwithstanding any exceptions claimed by the Government, the documents should be released in the public interest.**

100. LT Becker realleges and reincorporates the information in the foregoing paragraphs as though fully set forth herein.

101. FOIA's central purpose is to ensure that the government's activities be opened to the sharp eye of public scrutiny. *United States DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 774 (1989).

102. LT Becker's case generated, and continues to generate, a great deal of public interest.

103. It was featured in news articles in, among other outlets, the *San Diego Union Tribune*, *Navy Times*, and the *Daily Mail*.

104. Among the topics of interest written about in the articles was the fact that the U.S. had not asserted jurisdiction over an event concerning an American servicemember and his spouse.

105. On August 14, 2017, the *San Diego Union-Tribune* published a long article headlined "War hero claims Navy abandoned him, others cry murder" in which the facts of the Navy's request to cede jurisdiction to Belgium were included.

106. A *Navy Times* article from February 11, 2019, stated: "Serving at a NATO command and living in the city of Mons at the time of his wife's 2015 death, Becker fell under the alliance's Status of Forces Agreement, or SOFA.  Ratified in 1951, the SOFA allows for the U.S. military to take primary jurisdiction over cases involving alleged wrongdoing tied to personnel serving overseas.  But Navy leaders declined to take over Becker's case and only relented when former Defense Secretary James Mattis ordered them to do so in January 2018."

107. That last sentence refers to the fact that the failure to assert jurisdiction led to LT Becker's filing a mandamus claim against the U.S., seeking the court to direct the government to assert jurisdiction over LT Becker, as called for in the NATO SOFA. *Becker v. Mattis, et al*, Compl. 1:17-cv-02336-BAH (D.D.C. 2017).

108. While the Secretary of Defense ultimately directed the Navy to assert jurisdiction, questions regarding the Navy's request still exist.

109. A November 13, 2023, *Navy Times* article discussing LT Becker's appeal declared : "The appeal court's ruling last month is the latest step in a long legal saga that initially saw the Navy unwilling to prosecute one of their own, even though Becker was assigned to a NATO command in Belgium at the time and fell under the alliance's Status of Forces Agreement,

which allows the military to take jurisdiction over cases involving personnel overseas.  Why the Navy declined to take on Becker's case remains unclear."

110.  Thus, mere months ago, the question about why the Navy declined to assert jurisdiction is still in the public eye.

111.  Releasing these documents will provide the public with information regarding how the military attempted to deprive LT Becker of his constitutional rights, in violation of the law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court:

a.  Declare that all of the documents referred to by the Navy in its response to FOIA request DON-NAVY-2023-2479 must be released without redaction;

b.  Award Plaintiff the costs of this proceeding, including reasonable attorney's fees, as expressly permitted by 5 U.S.C. § 522(a)(4)(E)(i); and,

c.  Grant LT Becker such other and further relief as this Court deems just and proper.        .


Dated: January 18, 2024                                    Respectfully Submitted,


                                                             _/s/   David P. Sheldon_
                                                           David P. Sheldon (DC Bar # 446039)
                                                           Law Offices of David P. Sheldon, P.L.L.C.
                                                           100 M. St. SE, Suite 600
                                                           Washington, DC 20003
                                                           Tel: 202.546.9575
                                                           Fax: 202.546.0135