**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CRAIG BECKER,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**DEPARTMENT OF THE NAVY,**<br><br>**Defendant.** | **Civil Action No. 24-152 (JEB)** |

**MEMORANDUM OPINION**

Every story, it is said, has three sides. So, too, does this Freedom of Information Act dispute. On one side stands Plaintiff Craig R. Becker, on a quest for records concerning the Navy's handling of jurisdiction in his international homicide case. On another, the Navy, in its attempt to keep certain materials from Plaintiff's reach. In response to Plaintiff's 2022 FOIA request, the Navy identified hundreds of responsive records, releasing many while withholding others under various FOIA exemptions. Supplemental productions, Plaintiff's concessions, and an earlier ruling by this Court have since narrowed the universe of contested records and exemptions. Both parties now move for summary judgment.

That leaves the third side: the records themselves. Having reviewed them *in camera*, the Court will grant in part and deny in part the parties' Motions, ordering the release of some material but protecting the lion's share.

## I. Background

The Court starts by reprising much of the same history detailed the last time the parties were before it. See Becker v. U.S. Dep't of Navy, 2025 WL 1905641 (D.D.C. July 10, 2025).

We begin in Mons, Belgium, where Plaintiff was stationed as a Navy lieutenant, and where —in October 2015 — his wife, Johanna Becker, fell to her death from their apartment. See ECF No. 1 (Compl.), ¶¶ 2, 4–7. Belgian authorities arrested Becker for her murder in March 2016. Id., ¶ 16. The Navy delayed but ultimately asserted jurisdiction over the case, and Becker was returned to the United States thereafter for trial by court-martial. Id., ¶¶ 15, 17, 19–25. He was convicted of murder in 2022 and sentenced to life imprisonment. Id. at 1–2. He subsequently appealed the conviction, and, in December 2022, submitted a FOIA request seeking:

> any and all documents the Navy maintains, including but not limited to letters, emails, notes of conversations, forms, notes of meetings, and any other documented [*sic*] related to the decision by the Navy to recommend against the United States asserting jurisdiction in [his] case, as well as the ultimate decision by the Secretary of Defense to have the Navy assert jurisdiction.

ECF No. 1-1 (FOIA Request) at ECF pp. 2–3. He specifically sought responsive records created between October 8, 2015, and February 2, 2018. Id. at ECF p. 3. After much back and forth, the Navy issued a final response in October 2023, identifying 723 responsive pages, of which 492 were released to Plaintiff with redactions, 138 were withheld in full, and 93 were duplicates not separately released. See Compl., ¶¶ 59, 63.

Becker appealed the response in November 2023 and initiated this suit two months later. Id., ¶ 66. He alleged that Defendant had failed to timely respond to his appeal, improperly withheld responsive records, and erroneously invoked various FOIA exemptions. Id., ¶¶ 66–111. After more volleying, the Navy ultimately produced a Vaughn Index cataloguing the responsive records and shared those records again to assist Plaintiff in his review of that Index. See ECF Nos. 13 (Joint Status Rep.) at 1; 16-2 (Index) at ECF pp. 66–134; 16-4 (Records); see also Defs. of Wildlife v. U.S. Dep't of Agr., 311 F. Supp. 2d 44, 56 (D.D.C. 2004) (defining "a Vaughn

[I]ndex [a]s an affidavit that indexes and specifically describes withheld or redacted documents and explains why each withheld record is exempt from disclosure"). The Index catalogued 177 records — corresponding to 605 pages — some released, many withheld in full, and others partially withheld. See Index at ECF pp. 66–134; see also ECF Nos. 16-2 (Declaration of Richard Strong), ¶ 38 n.9 (attributing delta between 723 pages originally identified and 605 ultimately catalogued to duplication); 16 (Def. MSJ) at 2, 8 (similar).

The Navy first moved for summary judgment in February 2025, defending both the adequacy of its search, as well as its invocation of Exemptions 3 (material protected by other statutes), 5 (agency deliberation), 6 and 7(C) (personal-privacy protections), and 7(E) (law-enforcement processes). See Def. MSJ at 8–18; 5 U.S.C. § 552(b)(3), (5), (6), 7(C), 7(E). Plaintiff lodged several challenges — namely, that Exemptions 3 and 7(E) were inapplicable, and that Exemption 5 could not justify withholding material he already possessed through his criminal case. See ECF No. 18 (Pl. First Opp.) at 5–12. In July 2025, this Court granted Defendant's Motion in part and denied it in part, holding that Plaintiff had conceded the propriety of Exemptions 6 and 7(C) and that Exemption 3 was irrelevant because each invocation of it overlapped with 6 or 7(C). See Becker, 2025 WL 1905641, at *3–4. The Court further deferred ruling on Exemptions 5 and 7(E) pending the Navy's re-release of records already possessed by Becker. Id. Defendant thereafter delivered on the re-release. See ECF No. 29 (Pl. MSJ) at 4.

This did not, however, put the dispute to rest. Becker now moves for summary judgment, challenging the sufficiency of select Vaughn Index entries, the Navy's reliance on Exemptions 5 and 7(E), and the degree to which it properly segregated all material within the withheld records. Id. at 4–11; ECF No. 33 (Pl. Second Opp.) at 2–9. He also argues that government misconduct

and the public interest warrant release of all records. See Pl. MSJ at 11–14; Pl. Second Opp. at 6–7, 10. Defendant, in turn, opposes Plaintiff's Motion and cross-moves for summary judgment, maintaining that the Vaughn entries are adequate, its 5 and 7(E) withholdings are proper, disclosure would result in foreseeable harm, and it has released all reasonably segregable material. See ECF Nos. 31 (Combined Mot.) at 3–23; 32 (Def. Cross-MSJ) at 3–23; 35 (Def. Second Reply) at 1–7.

To aid in its determination, the Court on July 6, 2026, ordered the Government to submit the disputed records for *in camera* review. See Minute Order of July 6, 2026; see also Minute Order of July 15, 2026 (providing further guidance). The Court has now carefully assessed the redactions under each exemption and can decide the matter once and for all.

## II. Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact is one that would change the outcome of the litigation. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). In the event of conflicting evidence on a material issue, the court is to construe the evidence in the light most favorable to the non-moving party. See Sample v. Bureau of Prisons, 466 F.3d 1086, 1087 (D.C. Cir. 2006).

"FOIA cases typically and appropriately are decided on motions for summary judgment." Defs. of Wildlife v. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009); Bigwood v. U.S. Agency for Int'l Dev., 484 F. Supp. 2d 68, 73 (D.D.C. 2007). In those cases, the agency bears the ultimate burden of proof. See U.S. Dep't of Just. v. Tax Analysts, 492 U.S. 136, 142 n.3

(1989). The court may grant summary judgment based solely on information provided in an agency's affidavit or declaration when it describes "the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith." ACLU v. U.S. Dep't of Def., 628 F.3d 612, 619 (D.C. Cir. 2011). Such affidavits or declarations are accorded "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting Ground Saucer Watch, Inc. v. CIA, 692 F.2d 770, 771 (D.C. Cir. 1981)).

## III. Analysis

FOIA requires agencies to release records requested by a member of the public unless one of nine exemptions applies. Milner v. Dep't of the Navy, 562 U.S. 562, 564 (2011); see also 5 U.S.C. § 552(b) (listing exemptions). Those exemptions are exhaustive: if a responsive document does not fit within one, the agency must release it. Tax Analysts, 492 U.S. at 151. Even if a record falls within an exemption, the agency may withhold it only if "disclosure would harm an interest protected by [the] exemption." 5 U.S.C. § 552(a)(8)(A)(i)(I). Agencies "bear[] the burden of establishing that a claimed exemption applies." Citizens for Resp. & Ethics in Wash. v. Dep't of Just., 746 F.3d 1082, 1088 (D.C. Cir. 2014). Before evaluating whether Defendant has carried its burden here, some preliminaries are in order.

### A. Level Set

The starting point is the universe of records and exemptions in contention at this stage. As previously mentioned, the Navy released a Vaughn Index to Plaintiff cataloguing 605 pages, for which five exemptions were invoked: 3, 5, 6, 7(C), and 7(E). See Def. MSJ at 8; Index at

ECF pp. 66–134. Becker conceded 3, 6, and 7(C) earlier in this litigation, see Pl. MSJ at 2–3, leaving 129 records in dispute under 5 and 7(E) (totaling 433 pages). See Index at ECF pp. 66–134. At a later juncture, Defendant also produced dozens of records previously withheld under Exemption 5 to Plaintiff. See Pl. MSJ at 2. Because the parties never spell out which records were re-released — much less what content within those records was disclosed to Plaintiff — the Court first deemed all 129 records, and the information therein, as disputed. Contrast, e.g., Pl. First Opp. at 6–9 (Plaintiff lists "sampling of" 43 records already in his possession, "withheld in part or in full" by Defendant), and Pl. MSJ at 2 (Plaintiff says 43 records were ultimately re-released), with, e.g., ECF No. 20 (Def. First Reply) at 3 (Defendant states it "prepare[d] a re-release" of "approximately" 39 records, without defining which), and ECF No. 31-1 (Def. Stmt. of Facts), ¶ 27 (Defendant cites 39 re-releases again with no indication of specific records). Then, in its latest Minute Order, the Court requested that Defendant

> produce clean and redacted copies of any records or partial records for which the Government has invoked Exemption 5[,] . . . 7E, or both as the sole basis for withholding . . . . The clean versions may retain redactions of information for which the Government has invoked any other Exemption.

Minute Order of July 15, 2026. The Navy subsequently submitted all but three records — Vaughn Index numbers (VIs) 125, 126, and 138 — as those were also withheld under Exemptions 3, 6, and/or 7(C). See Index at ECF pp. 109–10, 115 (describing those records). Nor were any of the three included in Defendant's initial submission to the Court's previous Minute Order. See Minute Order of July 6, 2026. The same goes for certain pages within 18 records that were otherwise submitted (VIs 62, 64, 67, 69, 88–90, 101–03, 139, 147, 158–59, 168–71). The Court takes the omissions to mean that all those materials were simultaneously covered by 3, 6, or 7(C), leaving 126 records (and 404 pages) in play.

The Court understands Plaintiff to advance four principal arguments as to the remaining withholdings. First, Defendant's Vaughn Index descriptions are inadequate as to ten records. See Pl. MSJ at 4–5; Pl. Second Opp. at 2–3. Second, Exemptions 5 and 7(E) are inapplicable writ large. As to 7(E), Becker says so explicitly. See, e.g., Pl. Second Opp. at 2 (stating generally that Defendant's "use of Exemption 7(E) was improper"); Pl. MSJ at 5–6. His Exemption 5 challenge, conversely, requires some assembly. Although he never explicitly articulates a broad-based challenge to the exemption's applicability, the Court nonetheless understands him to press one, as he attacks certain sub-elements of the exemption and invokes the government-misconduct exception (an Exemption 5-specific doctrine). See Pl. MSJ at 11–12; Pl. Second Opp. at 4–8; Thompson v. U.S. Dep't of Just., Crim. Div., 146 F. Supp. 3d 72, 86 (D.D.C. 2015) (explaining that courts have applied government-misconduct exception under Exemption 5 only). Third, Becker contends that the public interest warrants disclosure. See Pl. MSJ at 12–14; Pl. Second Opp. at 3, 10. Fourth and last, he argues that Defendant failed to release all reasonably segregable material. See Pl. MSJ at 6–11; Pl. Second Opp. at 2–3, 8–10. Defendant, for its part, disputes each of these contentions and further maintains that it has satisfied the foreseeable-harm requirement. See Def. Cross-MSJ at 4–23.

One final point bears mention at the outset. Because the Court has itself reviewed all the remaining records *in camera*, it need not address separately Plaintiff's challenge to the adequacy of Defendant's Vaughn submissions. Indeed, the Court ordered *in camera* review in part because it found Defendant's evidentiary showing wanting, for many of the reasons elucidated in the ensuing analysis. See Quinon v. FBI, 86 F.3d 1222, 1227–28 (D.C. Cir. 1996) (quoting Lam Lek Chong v. DEA, 929 F.2d 729, 735 (D.C. Cir. 1991)) (describing "broad discretion" of trial

court to conduct *in camera* review, which "may be particularly appropriate when . . . the agency affidavits are insufficiently detailed to permit meaningful review of exemption claims").

With the table now set, the Court turns to the analysis, which proceeds in two parts. It first evaluates the propriety of Defendant's Exemption 5 and 7(E) withholdings. It therein evaluates Plaintiff's government-misconduct and public-interest theories, as well as Defendant's foreseeable-harm showing. It then examines whether Defendant has satisfied its segregability obligations.

B. Propriety of Defendant's Withholdings

As noted above, Exemptions 5 and 7(E) are the only exemptions now in dispute. The Court starts with the former.

1. *Exemption 5*

Exemption 5 applies to "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). That is, it permits an agency to withhold documents that would ordinarily be privileged in civil discovery. See NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149 (1975); United States v. Weber Aircraft Corp., 465 U.S. 792, 799 (1984). The three most common privileges invoked under Exemption 5 are the deliberative-process, attorney-work-product, and attorney-client privileges — any one of which is sufficient to bring a document within the exemption. See Am. Immigr. Council v. Dep't of Homeland Sec., 905 F. Supp. 2d 206, 216 (D.D.C. 2012).

The Navy invokes all three here. See Def. Cross-MSJ at 6–10; Strong Decl., ¶¶ 45–50; Index at ECF pp. 66–134. The Court evaluates each in turn but first addresses Becker's overarching argument as to Exemption 5 — "that this Court should preclude the Navy's use of

[the exemption] in instances where [he] already has an unredacted copy of the document" (presumably through discovery in his criminal case). See Pl. MSJ at 4; Pl. First Opp. at 6–8. The mere fact, however, that certain records may already be in his possession does not answer the antecedent question of whether Defendant has properly invoked the exemption. See S. Poverty L. Ctr. v. IRS, 589 F. Supp. 3d 79, 86 (D.D.C. 2022) ("As courts in this district have repeatedly held, the government's production of documents to private parties during discovery does not place them in the public domain for FOIA purposes."); see also Stonehill v. IRS, 558 F.3d 534, 538–39 (D.C. Cir. 2009) (distinguishing between disclosure in discovery versus FOIA). The Court therefore declines Plaintiff's invitation.

a. Deliberative-Process Privilege

First up is the deliberative-process privilege, which protects internal agency "advisory opinions, recommendations and deliberations" to safeguard "the decisionmaking processes of government agencies." Sears, Roebuck & Co., 421 U.S. at 150 (citations omitted). To qualify, a record must be "predecisional" — *i.e.*, "antecedent to the adoption of an agency policy." Jordan v. Dep't of Just., 591 F.2d 753, 773–74 (D.C. Cir. 1978) (*en banc*), overruled in part on other grounds, Crooker v. Bureau of Alcohol, Tobacco & Firearms, 670 F.2d 1051, 1053 (D.C. Cir. 1981) (*en banc*). And it must be "deliberative" in the sense that it "makes recommendations or expresses opinions on legal or policy matters." Vaughn v. Rosen, 523 F.2d 1136, 1144 (D.C.

Cir. 1975). "A document that does nothing more than explain an existing policy cannot be considered deliberative." Pub. Citizen, Inc. v. OMB, 598 F.3d 865, 876 (D.C. Cir. 2010).

Defendant invokes this privilege for all 126 records — 79 withheld in full and 47 withheld in part. See Strong Decl., ¶ 50; Index at ECF pp. 66–134 (listing 126 documents). Those records consist of

> memoranda, a country law study of Belgium, outlines of the incident and the investigation into the death of Mrs. Becker, letters regarding U.S. jurisdiction in Plaintiff's criminal case, attorney summaries of facts, legal issues, and evidence, a summary of foreign criminal jurisdiction process comparison under various Status of Forces Agreements (SOFAs), a timeline of relevant events in Plaintiff's criminal case, email correspondence, information papers, a printout of tasking regarding a Navy response to a congressional inquiry related to jurisdictional issues in Plaintiff's criminal case, attorney working notes, a draft internal public affairs document, and draft summaries, timelines, and comparisons of jurisdictional processes prescribed by different SOFAs.

Strong Decl., ¶ 50; see also Index at ECF pp. 66–134 ("Description of Record" column). As Defendant explains, the decision underlying those withholdings was whether the Navy would assert "[j]urisdiction in Plaintiff's criminal case." Strong Decl., ¶ 50. The Court's *in camera* review confirms that all 126 records indeed relate to that decision. Whether they all check the "predecisional" and "deliberative" boxes is a closer question.

On the predecisional score, Defendant represents that its "final [jurisdictional] decision [was] made on January 2, 2018." Strong Decl., ¶ 50. Yet the Court's *in camera* review revealed that 27 records bear dates after January 2 or otherwise contain retrospective language placing their creation after the Navy's final determination. Any such records that clearly post-date or provide a *post hoc* account of the decision cannot, by definition, be predecisional. See Senate of the Com. of P.R. *ex rel.* Judiciary Comm. v. U.S. Dep't of Just., 823 F.2d 574, 585 (D.C. Cir. 1987) ("A document is predecisional if it precedes, in temporal sequence, the decision to which

it relates.") (quotation marks omitted); Sears, Roebuck & Co., 421 U.S. at 151–52 (explaining that "communications made after the [agency's] decision and designed to explain it . . . are not" privileged). Defendant therefore does not prevail as to those 27 records or select pages therein: VIs 33–34, 85, 88–90, 92, 95, 98, 105, 108–10, 113–14, 116–19, 130–34, 170 (excluding Bates page 585), 171 (Bates page 587 only), and 176. See Index at ECF pp. 73–74, 91, 93–94, 96–97, 100, 102–07, 112–13, 131, 134. Plaintiff, for his part, points to an absence of dates in the Vaughn Index for ten records. See Pl. Second Opp. at 3. Dates are not, however, the only way to establish chronology. See Jud. Watch, Inc. v. FDA, 449 F.3d 141, 151 (D.C. Cir. 2006); see also Def. Reply at 2 (Navy making this argument in defense of privilege). Indeed, eight other records lack dates, but their consultative language indicates that they predate the decision. Those eight plus another 91 records clearly dated before January 2, 2018, make for a total of 99 records still in the running.

Up next is whether those 99 are "deliberative" in that they contain "recommendations or . . . opinions on legal or policy matters." Vaughn, 523 F.2d at 1144. The privilege accordingly protects "recommendations, draft documents, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980). Here, Defendant avers that the records "constitute nonfinal opinions and recommendations of attorneys to agency principals in preparation of the decision to assert U.S. [j]urisdiction in Plaintiff's criminal case." Strong Decl., ¶ 50. The Court's *in camera* review corroborates that characterization: all 99 records broadly consist of individual officials' and departments' interpretations of DoD policy, recommendations as to whether the Navy should exercise jurisdiction in Plaintiff's case, and the analyses and considerations informing those

recommendations. Cf. Coastal States, 617 F.2d at 868 (denying privilege where material was more like "a manual" outlining "the applicability of existing policy" to "a certain state of facts," rather than "factual or strategic advice giving") (quotation marks omitted).

Still, even where the deliberative-process privilege is met, it may not attach "where there is reason to believe the documents sought may shed light on government misconduct." In re Sealed Case, 121 F.3d 729, 738 (D.C. Cir. 1997); see also Thompson,146 F. Supp. 3d at 86 (explaining that courts have considered government-misconduct exception under Exemption 5 deliberative-process privilege only). Becker invokes that exception here, arguing that "all documents related to" the Navy's jurisdictional decision "should be released as they are potential evidence of government misconduct." Pl. MSJ at 11. His theory of misconduct? That Navy officials willfully ignored his constitutional rights by ceding jurisdiction to Belgium. See id. at 12 (citing 18 U.S.C. § 241, which prohibits conspiracies to deprive individuals of constitutional rights).

Without wading too far into what the misconduct exception requires, the issue for Plaintiff here is that the records do not evidence willful ignorance of his rights. For example, one Navy memorandum (filed as an exhibit by Plaintiff) states that certain agency officials based their recommendations against the United States's asserting jurisdiction over Becker's case "in part on [findings that] the Belgian system meets the standards of fundamental fairness as outlined in DoD Directive 5525.1" and that "[t]rial observers" "consistently reported a fundamentally fair process that ensured service members' due process rights." ECF No. 29-1 (Pl. MSJ Exhs.) at ECF p. 12. Other documents likewise reflect deliberation over whether Belgium's criminal process would safeguard Becker's "basic due process rights," ultimately determining that it would. See id. at ECF pp. 15–16, 22– 23, 30; see also Records at ECF pp. 76–81 (analysis

comparing "Belgian and American due process law") (formatting altered). Whether the Navy made the right determination as to Becker's rights is not the question before this Court. The relevant point here is that the records reflect sustained consideration of those rights, belying his theory. The Court's conclusion that the deliberative-process privilege applies to 99 of the 126 records therefore remains.

The journey for those 99 would ordinarily stop here, as the FOIA inquiry typically ends once any single exemption is established. See Tax Analysts, 492 U.S. at 151. But the Court proceeds on a somewhat longer route: it next considers the other bases for withholding as to all 126 records because the necessity of segregation (discussed below in Section III.C) depends in part on the applicable exemptions.

b. Attorney-Work-Product Privilege

The attorney-work-product privilege "shields materials prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative . . . ." Jud. Watch, Inc. v. Dep't of Just., 432 F.3d 366, 369 (D.C. Cir. 2005) (quotation marks omitted). Critically, the privilege does not apply "simply because litigation might someday occur." Hunton & Williams LLP v. EPA, 248 F. Supp. 3d 220, 251 (D.D.C. 2017) (citing Coastal States, 617 F.2d at 865). Rather, the relevant question is whether, "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." Id. (quoting United States v. Deloitte LLP, 610 F.3d 129, 137 (D.C. Cir. 2010)).

The most that Plaintiff explicitly argues regarding attorney work product, albeit in the segregability context, is that Defendant "has been inconsistent in claiming" it. See Pl. Second

Opp. at 8. On that point, the Court agrees. The Navy avers that 99 records are protected as attorney work product and describes those records as follows:

> executive summaries of facts and legal issues, comparisons of foreign criminal jurisdiction processes prescribed by different Status of Forces Agreements, draft case timelines in Plaintiff's criminal case, annotated with legal opinions and internal comments, and email correspondence of Navy attorneys and DoD General Counsel, all of which were prepared by Navy or DoD attorneys acting on behalf of the Navy and the DoD in the anticipation or furtherance of the criminal prosecution of Plaintiff.

Strong Decl., ¶ 46. Defendant's Vaughn Index, however, tells a narrower story, branding only 34 records as attorney work product: VIs 5, 33, 55, 77–78, 80–81, 92–93, 95, 96–99, 105, 111–16, 118–23, 130–32, 143, 147, and 175–76 (three withheld in part and the rest in full). See Index at ECF pp. 67, 73, 79, 89–91, 94–98, 100, 103–09, 112, 118, 120, 133–34. The Court accordingly confines its work-product analysis to those 34. See Strong Decl., ¶ 46 (merely citing 99 records under work-product privilege without specifying which); see also Senate of the Com. of P.R., 823 F.2d at 585 (explaining in Exemption 5 context "that the agency invoking a FOIA exemption bears the burden of establishing its right to withhold evidence from the public") (cleaned up); Alexander v. FBI, 192 F.R.D. 42, 46 (D.D.C. 2000) (stating for work-product privilege specifically that "the burden of showing that the materials were prepared in anticipation of litigation is on the party asserting privilege") (cleaned up).

As an initial note, certain records appear to have been decoupled from related materials, obscuring the involvement of agency lawyers in those records. Having pieced them together through its *in camera* review, however, the Court is satisfied that all 34 were prepared by or for counsel. Now, were these 34 prepared "because of the prospect of litigation"? Hunton & Williams, 248 F. Supp. 3d at 251 (quotation marks omitted). To that end, Defendant maintains that the records were prepared "in anticipation or furtherance of the criminal prosecution of

Plaintiff." Strong Decl., ¶ 46. To be sure, the Court found that all the records more precisely concern the antecedent question of whether Defendant would exercise jurisdiction over Becker. While the records do not suggest that agency officials anticipated litigation over that jurisdictional decision itself, DoD officials were undoubtedly contemplating jurisdiction with the eventuality of Becker's criminal prosecution in mind — be it in the United States or Belgium. That is sufficient to pass the "because of" test here. See, e.g., SafeCard Servs., 926 F.2d at 1203 ("[W]here an attorney prepares a document in the course of an active investigation focusing upon specific events and a specific possible violation by a specific party, it has litigation sufficiently 'in mind' for that document to qualify as attorney work product."); Ellis v. U.S. Dep't of Just., 110 F. Supp. 3d 99, 109 (D.D.C. 2015) (finding that records "created in preparation for criminal prosecution" were protected as work product and citing collection of cases that held similar).

The attorney-work-product privilege accordingly applies to all 34 records, including 14 of the 27 records not protected under deliberative process: VIs 33, 92, 95, 98, 105, 113–14, 116, 118–19, 130–32, and 176. At this point, 13 records therefore remain unshielded.

c. Attorney-Client Privilege

The remaining — attorney-client — privilege "protects confidential communications from clients to their attorneys made for the purpose of securing legal advice or services" and "from attorneys to their clients if the communications rest on confidential information obtained from the client." Tax Analysts v. IRS (Second Tax Analysts), 117 F.3d 607, 618 (D.C. Cir. 1997) (quotation marks and citation omitted). "In the governmental context, the 'client' may be the agency and the attorney may be the agency lawyer." Id. The Government must establish, *inter alia*, both that the communications were made in confidence and that their confidentiality

has been "maintained since." Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec., 841 F. Supp. 2d 142, 153–54 (D.D.C. 2012) (quoting Coastal States, 617 F.2d at 863).

The Navy invokes the privilege for 100 records, largely the same mix of "memoranda notes, email correspondence, executive summaries, and timelines" discussed above. See Strong Decl., ¶ 48 (cleaned up). It explains that those records were written by agency "attorneys and judge advocates" and "include legal opinions and recommendations to military, departmental, service, and secretariat leadership in anticipation and furtherance" of Becker's prosecution. Id. The Court has little difficulty concluding that the records it reviewed — principally emails exchanged between attorneys and memoranda shared by judge advocates with senior Navy personnel — were developed with an expectation of confidentiality.

Defendant stumbles, however, on the second requirement: that they remained confidential. Nowhere does the Navy represent that the confidentiality of those communications has been preserved. That alone renders its burden unsatisfied. Mead Data Cent., Inc. v. U.S. Dep't of Air Force, 566 F.2d 242, 253–54 (D.C. Cir. 1977) (requiring agency to establish for attorney-client privilege that information underlying document "was supplied . . . with the expectation of secrecy and was not known by or disclosed to any third party") (emphasis added); see also Coastal States, 617 F.2d at 863 (assigning burden of establishing continued confidentiality to agencies). Even if the Court were at liberty to assume confidentiality, see Am. Immigr. Council v. U.S. Dep't of Homeland Sec., 950 F. Supp. 2d 221, 244 (D.D.C. 2013) (saying that it is not), the record here does not permit any inferences to be drawn confidently on Defendant's behalf. The Navy invokes the privilege for certain records withheld in their entirety. See Index at ECF pp. 66–134. Yet many of those same records appear to have been given to Becker in full (or with one or two words concealed) through his criminal case. See Pl. MSJ at 6–

10 (identifying records obtained through case); Pl. MSJ Exhs. at ECF pp. 15–24, 26–31, 40, 54 (copies of those records). The Court thus cannot assure itself, on a record-by-record basis, what information has and has not remained confidential. The privilege, then, is unavailable to Defendant.

* * *

In sum, Exemption 5 protects 113 of the 126 disputed records — under the deliberative-process and/or attorney-work-product privileges.

2. *Exemption 7(E)*

The Court considers Exemption 7(E) as to the remaining 13 records: VIs 34, 85, 88–90, 108–10, 117, 133–34, and 170–71. This exemption permits an agency to withhold records "compiled for law enforcement purposes" if disclosure would reveal "techniques and procedures for law enforcement investigations or prosecutions," or "guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). Courts in this district accordingly require agencies to meet three requirements. First, that the records were compiled for a law-enforcement purpose. Id. Second, that they reveal law-enforcement techniques, procedures, or guidelines not generally known to the public. See Nat'l Whistleblower Ctr. v. Dep't of Health & Human Servs. (NWC), 849 F. Supp. 2d 13, 36 (D.D.C. 2012). Third, that disclosure could reasonably be expected to risk circumvention of the law. Id. (quoting 5 U.S.C. § 552(b)(7)(E)). The Court addresses each in turn.

a. Compiled for Law-Enforcement Purpose

The threshold inquiry is whether the records were "compiled for [a] law enforcement purpose[]." 5 U.S.C. § 552(b)(7); see also Pub. Emps. for Env't Resp. v. U.S. Section, Int'l

Boundary & Water Comm'n (PEER), 740 F.3d 195, 203–04 (D.C. Cir. 2014). A record satisfies that requirement "if it was created or acquired in the course of an investigation 'related to the enforcement of federal laws'" and bears "at least a colorable claim" of a rational "nexus between the investigation and one of the agency's law enforcement duties." Quinon v. FBI, 86 F.3d 1222, 1228 (D.C. Cir. 1996) (quoting Pratt v. Webster, 673 F.2d 408, 420–21 (D.C. Cir. 1982)). Our Circuit has further held that to qualify, records "must arise out of investigations which focus directly on specifically alleged illegal acts which could, if proved, result in civil or criminal sanctions." Bartko v. U.S. Dep't of Just., 898 F.3d 51, 64 (D.C. Cir. 2018) (quotation marks and citation omitted).

Defendant explains that the records here were "compiled to document the criminal investigation and prosecution of an alleged extraterritorial crime by a service member." Strong Decl., ¶ 52. That plainly constitutes a law-enforcement purpose and thus clears the threshold.

b. Techniques, Procedures, or Guidelines

The second requirement is that the records reveal law-enforcement techniques, procedures, or guidelines not generally known to the public. Courts typically understand techniques and procedures to refer to the methods or tools agencies use in conducting law-enforcement investigations, such as "polygraphs," "database[s]," and "hacking tool[s]." Jud. Watch, Inc. v. FDA, 821 F. Supp. 3d 20, 27 (D.D.C. 2026); see also, e.g., Blackwell v. FBI, 646 F.3d 37, 42 (D.C. Cir. 2011) (recognizing "forensic examinations" and "methods of data collection, organization and presentation" as law-enforcement techniques and procedures); Whittaker v. U.S. Dep't of Just., 2019 WL 2569915, at *2 (D.D.C. June 21, 2019) (quoting Allard K. Lowenstein Int'l Hum. Rts. Project v. Dep't of Homeland Sec. (Lowenstein Project),

626 F.3d 678, 682 (2d Cir. 2010)) (defining techniques and procedures as "how law enforcement officials go about investigating a crime").

To be sure, courts have extended Exemption 7(E) beyond "just the techniques and procedures themselves" to "information relating to law-enforcement techniques, policies, and procedures." Dalal v. U.S. Dep't of Just., 643 F. Supp. 3d 33, 75 (D.D.C. 2022) (quoting Showing Animals Respect & Kindness v. U.S. Dep't of Interior, 730 F. Supp. 2d 180, 199 (D.D.C. 2010)) (cleaned up). But even there, the materials at issue concerned the mechanics of law enforcement. See, e.g., id. at 74 (holding that 7(E) was properly invoked where documents contained, *inter alia*, information regarding FBI office locations, "dates and types of investigations," "methods for collection/analysis," "devices utilized in surveillance," and "databases"); Showing Animals Respect & Kindness, 730 F. Supp. 2d at 199–200 (same where records implicated "specific details of surveillance techniques, including equipment used and location and timing of use"). Our Circuit, moreover, has understood "guidelines" to encompass instructions governing agency personnel's use of law-enforcement techniques or procedures. See, e.g., PEER, 740 F.3d at 205 (accepting under Exemption 7(E) guidelines informing personnel how to "manage" and "investigate" emergency).

The Navy proffers three theories as to why the records here implicate techniques, procedures, and guidelines. First, the records contain information such as the "location" of the crime in Plaintiff's case, "the other jurisdiction involved, the state of the investigation, and the ability of [Defendant] to effectively prosecute." Strong Decl., ¶ 64. Second, jurisdictional decisionmaking itself constitutes a law-enforcement procedure. Id. Third, the withholdings implicate Defendant's "allocation of resources for law-enforcement investigations." Id. Plaintiff does not challenge these assertions, reserving his objections for the public-knowledge and

circumvention requirements (discussed below). See Pl. MSJ at 5–6; Pl. Second Opp. at 6. But those requirements come into play only if it is established that the records indeed implicate techniques, procedures, or guidelines in the first instance, so the Court must address that threshold issue.

Defendant's theories do not quite make that case. As to the first, the purported information — location, jurisdictions involved, state of the investigation, *etc.* — is described at too high a level of generality to fit, without more, the operational mold discussed above. The second theory strays even further: the bare act of deciding which sovereign will exercise criminal jurisdiction is not a tactical measure. And although the Second Circuit has understood "guidelines" to encompass "resource allocation," Lowenstein Project, 626 F.3d at 682, Defendant's description sheds no light on what those resources are.

Having now completed its *in camera* review, however, the Court is satisfied that nine of the remaining 13 records — VIs 34, 85, 88–90, 110, 117, 133, and 170 — implicate law-enforcement techniques and procedures. The records contain information regarding specific investigative steps taken by Belgium and its foreign-relations interactions with the Navy. Although this may not fall squarely within the box of paradigmatic tools and methodologies discussed in the cases above, the Court finds it sufficient here — particularly where that material implicates national-security considerations. See ECF No. 20-2 (Supplemental Declaration of Richard Strong), ¶ 15 (describing national-security stakes here); Ctr. for Nat'l Sec. Stud. v. U.S. Dep't of Just., 331 F.3d 918, 927 (D.C. Cir. 2003) (giving deference to agency "when national security concerns are implicated" in Exemption 7 material).

Four records (VIs 108–09, 134, and 171), however, do not clear the bar, as they lack discussion of Belgium's investigations or dealings with the Navy. The Court will thus order Defendant to release those four to Plaintiff.

As to the requirement that the records "not [be] generally known to the public," NWC, 849 F. Supp. 2d at 36, Plaintiff argues that "the rationale [Defendant] used to attempt to cede jurisdiction is already in the public record," citing media reporting about his case. See Pl. MSJ at 6. That argument, however, confuses public knowledge of Becker's prosecution with knowledge regarding the investigative techniques and procedures employed by Defendant. Exemption 7(E) contemplates the latter. Having reviewed the records, the Court is satisfied that the particulars of Defendant's decisionmaking reflected in the nine records are not generally known to the public. Indeed, Defendant maintains that "[t]o the extent [it] has publicly acknowledged that it first declined to assert jurisdiction in Plaintiff's criminal case and subsequently asserted jurisdiction, [it] has not publicly acknowledged the factors [it] generally considers" in making jurisdictional determinations, "or the specific factors [it] considered" to arrive at the decision in Becker's case. See Strong Supp. Decl., ¶ 13; cf. Sack v. U.S. Dep't of Def., 823 F.3d 687, 694 (D.C. Cir. 2016) (explaining that even where public generally knows of technique or procedure, Exemption 7(E) applies where disclosure would reveal incremental information). The nine records implicating techniques and procedures thus remain in contention.

c. Risk of Circumvention of the Law

The final requirement for those records (as a reminder, VIs 34, 85, 88–90, 110, 117, 133, and 170) is that disclosure "could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). That requirement sets a "relatively low bar," requiring only a reasonable expectation of such a risk, not certainty. Blackwell, 646 F.3d at 42. Defendant here explains

that disclosure would "enable criminals to predict and influence" its jurisdictional decisionmaking — *e.g.,* by selectively disclosing information to investigators or meddling with witnesses. See Strong Decl., ¶ 65. Plaintiff refutes this assertion by stating that "there is no Navy decision-making to influence" because, in his rendering, "it is the position and policy of the United States to not cede jurisdiction over Service members to a foreign country when the United States has primary jurisdiction." Pl. MSJ at 6. Becker's interpretation of Navy policy, however, does not have any bearing on this inquiry and, in any event, the Court is satisfied that Defendant's assertions "logically" demonstrate how disclosure of the withheld information could create such a risk, thereby clearing the "relatively low" hurdle. Blackwell, 646 F.3d at 42; cf. Stephens v. Dep't of Just., 26 F. Supp. 3d 59, 73 (D.D.C. 2014) (finding requirement satisfied where agency asserted that "[d]isclosure could enable criminals [or targets] to educate themselves about the . . . investigative techniques and procedures" and "take countermeasures to circumvent [their] effectiveness") (second and third alterations in original).

*    *    *

That leaves four records (VIs 108–09, 134, and 171) protected by neither Exemption 5 nor 7E. The Court will thus order Defendant to release these records to Plaintiff, minus the pages Defendant excluded from its *in camera* submission (Bates pages 586 and 588). See *supra* Section III.A.

3. *Foreseeable Harm*

That is not, however, the end of the matter. Even where a record falls within a FOIA exemption, an agency may withhold the material only if it "reasonably foresees that disclosure would harm an interest protected by" that exemption. See 5 U.S.C. § 552(a)(8)(A)(i)(I). An agency therefore must "identify specific harms to the relevant protected interests that it can

reasonably foresee would actually ensue from disclosure of the withheld materials" and "connect [those] harms in a meaningful way to the information withheld." Ctr. for Investigative Reporting v. U.S. Customs and Border Prot., 436 F. Supp. 3d 90, 106 (D.D.C. 2019) (cleaned up).

Start with Exemption 5. The deliberative-process privilege specifically requires that an agency provide a "focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward." Reps. Comm. for Freedom of the Press v. FBI (RCFP), 3 F.4th 350, 370 (D.C. Cir. 2021). Defendant provides the same assertion for all records it withholds under privilege: that disclosure "would reduce candor" among Navy attorneys and leadership — *e.g.*, by chilling "discussion of their views of the Status of Forces Agreements [SOFAs] for fear that such communication would be released and used against the Navy in future litigation and could negatively affect the United States' foreign policy relationships and goals." Def. MSJ at 14.

To be sure, the Navy's rationale is wanting in some respects. Its reliance on a single explanation for all 126 records approximates the "boilerplate" rationale our Circuit cautions against. See RCFP, 3 F.4th at 369 (stating that, although disfavored, agencies may satisfy foreseeable-harm requirement on "category-by-category basis" only where "the basis and likelihood of that harm [is] independently demonstrated for each category"). On the other hand, it is a more concrete account of foreseeable harm than the "wholly generalized," id. at 370, assertions rejected by courts in other cases. In RCFP, for example, the court was unconvinced by Defendant's contention — *viz.,* that disclosure would chill discussion and reduce candor among agency personnel — because it merely recapitulated the principles animating the

"deliberative process privilege itself." Id. (agency stated that "[d]isclosure . . . would have an inhibiting effect" on "decisionmaking and the development of policy because it would chill full and frank discussions between agency personnel and decision makers regarding a decision"). Here, by contrast, Defendant zeroes in on jurisdictional determinations specifically, names certain international agreements implicated (*i.e.*, SOFAs), and explains why disclosure would impair agency dialogue. Cf. Machado Amadis v. U.S. Dep't of State, 971 F.3d 364, 371 (D.D.C. 2020) (accepting foreseeable-harm rationale where agency "specifically focused on the information at issue" in disputed records) (quotation marks omitted).

Courts in this district have, moreover, recognized that the degree of explanation necessary to establish foreseeable harm exists on something of a spectrum. On one end, where the sensitivity of the deliberations is obvious, "a simple statement illustrating why the privilege applies and identifying the harm likely to result from release may be enough." Rosenberg v. U.S. Dep't of Def., 442 F. Supp. 3d 240, 259 (D.D.C. 2020) (quotation marks omitted). Examples include discussions among senior agency officials about covert military and investigatory operations. Id.; RCFP, 3 F.4th at 372. On the other end lie discussions about contractor selection or facilities management. Rosenberg, 442 F. Supp. 3d at 259–60, 263. The records here fall much closer to the former category: upon its review, the Court finds that disclosure of detailed jurisdictional deliberations could plausibly yield the harms Defendant cites. This same logic satisfies its burden as to the 14 records for which the attorney-work-product privilege solely applies.

As to the foreseeability of harm for Exemption 7(E), Defendant re-asserts the same risks here as it does for the circumvention-of-law requirement. See Def. MSJ at 15. That explanation passes muster, too, for the reasons explained above. See *supra* Section III.B.2.c.

Defendant thus meets the mark for both exemptions. See Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just., 2024 WL 3858560, at *9 (D.D.C. Aug. 19, 2024) (relying in part on *in camera* review to find foreseeable harm established); RCFP, 3 F.4th at 372 (stating that record itself may demonstrate foreseeable harm).

4. *Plaintiff's Public-Interest Argument*

Becker takes one final bite at the apple, maintaining that the public interest favors disclosure of all records. See Pl. MSJ at 12–13; Opp. at 10. As Defendant correctly observes, however, the public-interest doctrine upon which he relies applies only to Exemptions 6 and 7(C). See Def. Reply at 6–7; see, e.g., Shapiro v. Dep't of Just., 34 F. Supp. 3d 89, 94–95 (D.D.C. 2014) (applying public-interest "balancing test" to 6 and 7(C)). As Becker has already conceded those exemptions, his theory is unavailable.

The Court therefore concludes, at long last, that Defendant properly invokes Exemptions 5 and 7(E) for 122 records — that is, all records in dispute except the four the Court earlier deemed unprotected.

C. Segregability

We are not quite at the finish line. FOIA additionally requires that any "reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). This "applies to all documents and all exemptions in the FOIA." Ctr. for Auto Safety v. EPA, 731 F.2d 16, 21 (D.C. Cir. 1984).

The Court takes Becker to challenge segregability generally, although he does so by highlighting five examples. See Pl. MSJ at 7–11 (VIs 33, 88, 91, 110, and 132). He specifically objects to redactions of "[d]ates, headings, [and] subject lines," as well as pieces of information he characterizes as "factual." Id. at 10–11. Defendant rejoins that (1) records fully protected by

the attorney-work-product doctrine do not require segregation, (2) it need not release tidbits with low-informational value, and (3) it conducted a "line-by-line analysis" and released all reasonably segregable material. See Def. MSJ at 18–20. The Court addresses each argument in turn.

First, Defendant is correct that records protected as attorney work product do not require segregation, since "the work-product doctrine simply does not distinguish between factual and deliberative material." Jud. Watch, 432 F.3d at 371 (quotation marks omitted). The 34 records for which Defendant properly claims work-product privilege — of which 31 are withheld *in toto* and three are withheld in large part under the same protection (VIs 55, 143, and 147) — need not be segregated. See *supra* Section III.B.1; Index at ECF pp. 66–134.

Next, for the 88 generally protected records that remain, the Court confirms Defendant's view that non-substantive information falls outside of the segregability requirement. Mead Data Cent., Inc. v. U.S. Dep't of Air Force, 566 F.2d 242, 261 n.55 (D.C. Cir. 1977) (authorizing courts to exempt agencies from burden of segregating "disjointed words, phrases, or even sentences" possessing "minimal or no information content"). Any such items here — including the "TAB C" heading Becker identifies, other signposting, email greetings, and the like — need not undergo segregation analysis.

Defendant's contention that it conducted a "careful line-by-line analysis," however, does not carry the day. See Def. MSJ at 20; Strong Decl., ¶ 37. To be sure, agencies enjoy a presumption that their segregability obligations have been satisfied, and courts often accept declarations that records were reviewed "line-by-line." De Sousa v. CIA, 239 F. Supp. 3d 179, 203 (D.D.C. 2017). The Court may, however, undertake its own *in camera* review out of "an

abundance of caution." Bartko v. U.S. Dep't of Just., 167 F. Supp. 3d 55, 73 (D.D.C. 2016). It does so here.

Finally, where an agency has invoked the deliberative-process privilege to withhold records, it must ordinarily sever "purely factual information" from deliberative content. Petroleum Info. Corp. v. U.S. Dep't of Interior, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (quotation marks omitted). True, that "fact/opinion distinction" may not be "dispositive" in situations where "the disclosure of even purely factual material may so expose the deliberative process within an agency that the material is appropriately held privileged." Id. (quotation marks omitted). The Court does not find that to be the case here for some factual background regarding Becker's case and descriptions of agency policy. Such information would not, without more, "so expose" the Navy's jurisdictional deliberations as to warrant withholding. That conclusion is reinforced by the Navy's own disclosures in this litigation, which already reveal comparable factual material alongside recommendation-oriented content. See Records at ECF pp. 3–7, 33–35, 49–81. As discussed further below, the Court therefore concludes that certain statements of fact contained in the remaining 88 records are reasonably segregable.

With that, we have reached the end. After (1) accounting for the records that Defendant released to Becker alongside the Vaughn Index; (2) exempting records fully protected by the attorney-work-product doctrine; (3) excluding material properly withheld under the other privileges and exemptions; and (4) disregarding material with no meaningful informational value, the Court concludes that 29 records can be further segregated. It finds, more specifically, that those records contain extractable factual information about Becker's case and non-interpretive statements of DoD or NATO policy. See Pub. Citizen, 598 F.3d at 876 (stating that an agency may not "avail itself of Exemption 5 to shield existing policy from disclosure simply

by describing the policy in a document that as a whole is predecisional," since "[o]nly those portions of a predecisional document that reflect the give and take of the deliberative process may be withheld"). The Court accordingly orders that Defendant release any (1) factual background concerning Becker's case that was disclosed during his criminal proceedings or is otherwise public information; (2) quotations and non-interpretive descriptions of DoD or NATO policy; and (3) non-interpretive descriptions of caselaw in the following 29 records:

| Record | Specific Bates page numbers with segregable information |
|---|---|
| VI 3 | 003 |
| VI 4 | 006 |
| VI 12 | 027–28 |
| VI 18 | 098 |
| VI 19 | 100 |
| VI 34 | 147, 153 |
| VI 38 | 177–80 |
| VI 44 | 205 |
| VI 47 | 211 |
| VI 61 | 245–46, 248 |
| VI 74 | 283 |
| VI 85 | 360 |
| VI 86 | 361 |
| VI 88 | 365 |
| VI 89 | 367 |
| VI 90 | 369 |
| VI 91 | 371 |
| VI 100 | 385–86 |
| VI 104 | 393 |
| VI 110 | 411–13 |
| VI 129 | 426 |
| VI 137 | 489 |
| VI 140 | 495–96 |
| VI 156 | 526 |
| VI 157 | 528 |
| VI 158 | 533 |
| VI 163 | 548 |
| VI 165 | 558–59 |
| VI 170 | 577–78, 581 |

## IV. Conclusion

For the foregoing reasons, the Court will grant in part and deny in part both Motions, ordering Defendant to (1) release four records (in whole or substantial part) to Plaintiff — VIs 108–09, 134, and 171, specifically Bates pages 407–10, 484, and 587 — and (2) release segregable information in the 29 records detailed above. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: August 13, 2026